Loretta **AMMON**, Plaintiff,

v.

The **BARON AUTOMOTIVE GROUP** d/b/a Baron BMW, Defendant.

No. CIV.A. 02–2242–KHV.

United States District Court, D. Kansas.

July 10, 2003.

---

Joseph J. Roper, Patricia A. Mullins, Foland Wickens Eisfelder Roper & Hofer PC, Kansas City, MO, for Plaintiff.

David J. Roberts, Kevin D. Case, Case & Roberts, Case & Roberts, PC, Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Loretta Ammon filed suit against her former employer, The Baron Automotive Group d/b/a Baron BMW, for sexual harassment and discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and intentional and negligent infliction of emotional distress under Kansas state law. This matter comes before the Court on the *Motion For Summary Judgment Of The Defendant The Baron Automotive Group* (Doc. # 96) filed April 4, 2003. For reasons stated below, the Court sustains defendant's motion in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### Factual Background

For purposes of defendant's motion for summary judgment, the following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff.[1]

The Baron Automotive Group, Inc. does business as Baron BMW, an automobile

---

1. The Court has included only those facts which are relevant to the discussion of defendant's motion for summary judgment. For example, the Court has excluded several of defendant's facts which show that one other

dealership in Merriam, Kansas. Bart Cohen, Marion Battaglia and Baron Cass own Baron BMW ("Baron"). In August of 2000, Baron hired plaintiff, a female, to answer telephone calls. Shortly after plaintiff started, she attended training and Baron transferred her to new car sales. She worked as a new car salesperson until she left the dealership in April of 2001.[2] Although Baron had previously employed a female salesperson, plaintiff was the only female new car salesperson from August of 2000 through April of 2001. During plaintiff's tenure, Battaglia was the general manager at Baron and Scott Miller, the new car sales manager, was her supervisor.

*Plaintiff's Affair With Battaglia*

From the first week she worked at Baron through January of 2001, plaintiff had a consensual affair with Battaglia. Plaintiff and Battaglia had sex a "couple of times." In the workplace, Battaglia frequently referred to plaintiff as "dolly" or "honey." On one occasion near Battaglia's office, plaintiff and Battaglia discussed a story about oral sex. Plaintiff and Battaglia ended the affair in January of 2001. According to Battaglia, plaintiff became very unstable, would make inappropriate comments and became very mean. On one occasion, Battaglia thought that plaintiff had threatened him by saying "wouldn't it be a scandal if everybody found out about you and I." After the affair was over, she offered him money for sex in a joking fashion.

*Baron's Sexual Harassment Policy And Complaints Thereunder*

In response to an EEOC questionnaire, plaintiff stated that Baron had a well-publicized policy regarding harassment and a procedure for asserting complaints, and that she complained to Battaglia about sexual harassment. During its annual reviews, Baron requires each new car salesperson to acknowledge the anti-harassment policy which is part of the employee manual. Baron states that it has an open door policy which allows employees to discuss their concerns with any manager. Employees could report sexual harassment to their immediate supervisor or if their supervisor was the harasser, to Battaglia, Cohen, or Eileen Alsbrooks (the human resources manager).

From 1994 through 2001, Reva Weathered was Baron's office manager. During Weathered's tenure, no one made a formal complaint of harassment and she can recall no informal complaints. Except on one occasion where Battaglia told Weathered that plaintiff needed to be instructed not to wear short skirts, Weathered cannot recall any conversations with Battaglia about plaintiff.

From January through April of 2001, Baron employed Gail Fuller as a human

woman worked at Baron but did not complain of harassment, *see* Baron's Statement of Uncontroverted Facts SOF ¶¶ 94–95 in *Memorandum Of Law In Support Of The Motion For Summary Judgment Of Defendant The Baron Automotive Group* (Doc. # 97) filed April 5, 2003, that some employees including plaintiff occasionally brought their daughters to work, *see id.* ¶¶ 96–97, that plaintiff's daughter knew several of the new car salespeople and socialized with them, *see id.* ¶¶ 98–102, that a male salesperson formed a Christian prayer group with a few other employees and met weekly at the dealership, *see id.* ¶¶ 126–130, that plaintiff's parents did not know certain aspects of her sexual harassment complaints, *see id.* ¶¶ 12, 324–26, and the details of how plaintiff's daughter knew plaintiff's counselor, *see id.* ¶¶ 328–29. The Court recognizes that some of these facts may be relevant circumstantial evidence as to certain disputed issues at trial, but on a motion for summary judgment, the Court finds that these facts are unnecessary.

2. In February of 2001, plaintiff had surgery and did not work for almost an entire month.

resources employee. No employee complained to Fuller about sexual harassment or gender discrimination. During her tenure, Fuller left messages daily for Battaglia about gender discrimination and sexual harassment. She also told Battaglia that she thought that employees were afraid to talk to her about sexual harassment or discrimination.

Fuller also recommended that Wynn Fielder, a new car salesperson, be terminated because she felt that he harassed her.[3] Fuller never witnessed any harassment of plaintiff. Fuller testified that employees did not follow Baron's sexual harassment policy. Fuller and Terry Sommerset, a new car salesperson, felt that Baron did not have anyone for employees to complain to regarding sexual harassment and discrimination because management would not take any action. Fuller also testified that she did not have upper management's cooperation in enforcing Baron's sexual harassment and discrimination policies.

In January of 2001, Tim Suarez, who had worked at Baron before plaintiff was hired, returned to the dealership as finance director. Baron trained Suarez that if he received a complaint, he should report it to Battaglia or the office manager and take corrective action. Suarez testified that if someone informed upper management of unwelcome sexual comments, a manager should write up the individual and report the incident. Suarez stated that unwelcome sexual comments were not tolerated. Suarez recalls reporting one incident of sexual harassment when a female salesperson reported that she received calls late at night from her boss. The salesperson had taped the phone call which included inappropriate language. The salesperson reported the incident to Suarez and played a tape recording of the phone call. Although Suarez believed that the female salesperson and her boss might have had a consensual relationship, Suarez reported the incident to Alsbrooks.

*Workplace Environment And Sexual Comments*

At Baron, new car salespeople often had free time when few or no customers were in the showroom. During those times, salespeople generally talked with each other. Plaintiff often sat near the front door with two other salespeople: Fielder and Marty Levine. Plaintiff spent most of her time at the dealership with Fielder, Levine, Joe Lasker and Battaglia.

Many employees believed that Battaglia and plaintiff were having an affair.

On one occasion when plaintiff arrived to work carrying a Fairmont Hotel coffee cup, Miller asked her whether she had a good night at the Fairmont and then sneered and laughed. On another occasion, Miller asked plaintiff whether she had spent the night with a male customer who had been in the dealership the previous day. Miller and Battaglia once told Fuller that plaintiff wanted to use them as sexual toys. Battaglia maintains that he made the comment because plaintiff referred to him and Miller as "boy toys."[4]

---

**3.** In part, Fielder had told Fuller that she had "nice legs" and that she "should wear a dress more often." He also commented to her about another female's "boobs" and suggested "let's go have drinks."

**4.** Plaintiff also felt that Miller was a harsh manager. If she had any questions, Miller would make her feel stupid. Miller made demeaning or degrading remarks to plaintiff such as "use common sense," "shut up," "do you ever shut up," and "you always have excuses." Miller tried to embarrass plaintiff and talk behind her back. Miller also became upset when plaintiff attempted to go around him to Battaglia. According to Sommerset, Miller told him that he felt like plaintiff had leverage with Battaglia and that he could not fire her without Battaglia coming to her aid and assistance. According to plaintiff, she

Sommerset frequently made comments to plaintiff such as "God, you look hot today" and "I'd love to lick those pants off of you." Plaintiff's Depo. at 174–75; *see* Plaintiff's Responses To Defendant's First Interrogatories at 12, attached as Exhibit 24 to *Exhibits In Support Of Defendant The Baron Automotive Group's Reply In Support Of Its Motion For Summary Judgement* (Doc. #104) filed May 14, 2003. Plaintiff did not complain to Miller or Battaglia about the comments. Plaintiff testified that she ignored the comments and tried to do her work.

Sommerset heard Fielder make sexual comments in plaintiff's presence or about plaintiff about 20 times. Plaintiff never complained to Sommerset about the way other salesmen, including Fielder, treated her.

Dave Smith, a new car salesperson, asked plaintiff to climb up on the roof of a SUV so he could look at her in her skirt. Plaintiff did not say anything in response.

Levine associated plaintiff's attire with a street walker or a school teacher. Levine made frequent comments about plaintiff's attire, but plaintiff did not complain to Miller, Battaglia or Cohen about his conduct.

Suarez heard comments of a sexual nature when plaintiff was in the used car sales area. Plaintiff never indicated to Suarez that those comments were unwelcome and Suarez had no reason to believe that plaintiff was offended. Suarez testified that if he had thought the comments offended plaintiff, he would have reported the incident.

Fielder asked plaintiff for naked pictures of herself to show on the internet. Fielder had nude pictures of his girlfriend swimming and a picture of himself on the internet with his penis exposed. Plaintiff saw the pictures, looked and blushed, but did not say anything. Sommerset observed the incident, but he did not report it to anyone in management. Fielder also kept a photograph of a naked woman at his desk. Fielder asked plaintiff whether the picture turned her on and she replied no.

On one occasion, Fielder told plaintiff to go look at a picture of another salesperson's naked wife on a computer. Plaintiff walked by the computer and said "is that really [his] wife?" When plaintiff saw Battaglia shortly thereafter, she said "Oh, my gosh, I can't believe they have [his] wife naked. I didn't know that she's on the Internet." Plaintiff's Depo. at 194. Battaglia just "kind of looked and smiled." *Id.*

On one occasion, Fielder asked plaintiff if Carolyn Marlotte, the receptionist, would be interested in seeing some pornographic videotapes. Plaintiff told him that she did not know, so Fielder told her to go ask Marlotte. Plaintiff did so and reported back to Fielder that Marlotte was interested.

Marlotte testified that plaintiff and Fielder talked, went to lunch together and seemed to be good friends.

Kevin Kious, a new car salesperson, testified that he heard Fielder have conversations of a sexual nature every week or two, but that he did not consider these conver-

had quit a couple of times before April of 2001.

During 2000 and 2001, employees other than plaintiff complained to Battaglia about Miller. In April of 1999, such comments were "pretty frequent." Miller .was a very stern manager. At least four male salespeo-

ple had disagreements with Miller. On one occasion with Sommerset (a male salesperson), Miller used profanity and told Sommerset that he did not "have time for this fucking shit." Miller referred to Sommerset as stupid and a stupid bitch.

sations sexual harassment because women either were not present or also engaged in the conversation. *See* Kious Depo. at 19–20. Kious cannot recall any occasion where a woman complained or seemed uncomfortable.

Conversations of a sexual nature were pervasive among the salespeople at Baron. Although Fuller did not witness plaintiff being sexually harassed, she observed examples of sexual harassment on a daily basis. Michael Diaz, a new car salesperson, complained to Cohen about conversations with a sexual content that he heard about once a month. Kious testified that at Baron, employees use profanity on a daily basis and frequently engage in conversations of a sexual nature. *See* Kious Depo. at 10–11, 15. Kious also testified that once every couple of months, he heard Battaglia engage in conversations of a sexual nature where other salespeople and members of management were present. *See id.* at 11.

Except as to Battaglia, plaintiff found the above sexual chatter and conversations unwelcome.

*Threat By Martin*

On one occasion, plaintiff interrupted a conversation between new car salesperson Bill Martin and a customer, to ask Martin for a set of car keys. Martin later stood near plaintiff and told her to never interrupt him again. Martin told her to stay out of his way and that he would have her fired. Plaintiff was upset and frightened. Martin spoke to plaintiff in a threatening manner because plaintiff had requested the set of keys. Plaintiff told Miller about the incident. Miller and plaintiff notified Battaglia about the incident. Miller talked to Martin and after the incident, Martin and plaintiff had very limited contact.

*Phone System*

All of the salespeople at Baron obtained a portion of their sales income through incoming phone calls on the general sales line (line 405). Baron moved into its new building in August of 2000. When someone called the dealership and stated that they were interested in buying a new BMW, the receptionist, Carolyn Marlotte, would either (1) transfer the call to the general sales line which would ring the phone of every new car salesperson except plaintiff or (2) transfer the call to a particular salesperson. Marlotte transferred approximately 20 to 30 calls per day to the general sales line. Marlotte could send calls to plaintiff's desk by transferring the call directly to plaintiff's line or by calling plaintiff on her Nextel cell phone.

Because of the problems with the phone system, plaintiff did not receive the same number of incoming calls as other salespeople. Marlotte attempted to transfer some calls directly to plaintiff so that she would not be disadvantaged by the phone system. Marlotte would either call plaintiff on her cell phone or she would ask plaintiff whether she could pick up the call. Marlotte does not think that plaintiff received fewer calls than other salespeople. Fuller did not feel that the phone problem was related to plaintiff being a woman.

Plaintiff complained to Miller five to seven times that her phone was not ringing on the general sales line. Plaintiff testified that she probably also told Battaglia of the phone problems.

Kious, a new car salesman, started in April of 2001. When he started, his phone also was not hooked up to the main sales line. Baron did not hook up Kious' phone for three to four months. Kious stated that Baron did not hook up the phone because Miller did not care.

A contractor who worked on Baron phones testified that he could have added a phone to the general sales line in approximately 20 minutes.

*Plaintiff's Desk Location*

Baron assigns desks to new car salespeople based on seniority. Plaintiff sat in

the same place for her entire tenure at Baron. Her desk was partly visible from the front desk and her view was less obstructed than the view from a lot of other sales desks.[5] Except to make phone calls or sit with customers to finalize paperwork, plaintiff did not sit at her desk. Plaintiff generally sat in the used car department, near the front by Fielder's desk or outside on the front wall. Plaintiff would greet customers as they walked into the dealership.

At first, plaintiff was unhappy with her desk location and asked to be moved. She then realized that her location was advantageous because she was up front near incoming clients. When Baron hired new salespeople after plaintiff, plaintiff told Battaglia that she wanted to keep her desk location. Likewise, when plaintiff returned from surgery in late February of 2001, she asked to keep her same desk location.[6] Plaintiff had a running joke with Battaglia. She told him "I promise not to call you late at night if you promise not to hire another female worker and put her in my desk." Plaintiff testified that with respect to customer sales, she had an advantage as the only female new car salesperson at Baron.

### Referrals From Management

Kious and Martin have received sales through referrals from their managers.

Kious receives such referrals "occasionally."[7] Plaintiff received one referral from her supervisor Miller, but she never received *sales* through referrals from her managers.

### Kansas City Auto Show

Plaintiff was scheduled to work for Baron at the Kansas City Auto Show in March of 2001. Shortly before the show, Sommerset told plaintiff that Miller had reported that plaintiff and Battaglia were having sex and Battaglia's wife did not appreciate it. Plaintiff called Battaglia and told him that she was not going to work the auto show because of Sommerset's comment.

### Sales Meeting of April 21, 2001

On Saturday, April 21, 2001, plaintiff attended a sales meeting which started at 8:45 a.m. Instead of watching a video at the sales meeting, plaintiff told Miller that she needed to greet her customers and give them their car. Miller responded that he had customers too, and that they could wait. Miller told plaintiff to never again schedule a car delivery on a Saturday.[8] Miller then said, "Good morning to you too, you fucking bitch;" or "Good morning to you too," then said "fucking bitch." Plaintiff got up, slammed her chair back into the table and said something to the effect that "You can't call me a fucking

**5.** Plaintiff's desk assignment was better than the desk assignment of Kious. Diaz testified that he would have preferred to have plaintiff's desk.

**6.** Plaintiff claims that her desk was located behind a wall without visual access to the showroom floors or the front doors. *See Plaintiff's Memorandum In Opposition Of Defendant's Motion For Summary Judgment* (Doc. # 102) filed April 24, 2003 at 17, 19, 31. In support, plaintiff cites only the blueprints of the Baron showroom floor. The blueprints are not properly authenticated under D. Kan.

Rule 56.1(d) and the Court therefore excludes them. In any event, the blueprints do not indicate where plaintiff's desk and the desks of other new car salespeople were located.

**7.** Chad Bunton, an employee in the service department, testified that he gives referrals to new car salespeople two or three times per year.

**8.** The delivery coordinator at the dealership, not plaintiff, had scheduled the delivery for that Saturday.

bitch." Plaintiff left the dealership that morning shortly after the incident.

Battaglia was in Los Angeles at the time of the altercation between Miller and plaintiff. Plaintiff called Battaglia after she left the dealership that Saturday. Plaintiff explained the incident to Battaglia and told him that because Battaglia never did anything about Miller's behavior, she had contacted an attorney to handle the situation. Battaglia told plaintiff that he would address the incident when he returned. When Battaglia returned, he had a "very strong conversation" with Miller. Battaglia told Miller that his comment was inappropriate; that such comments would not be tolerated; and that no matter how mad he gets or whether he is provoked, he should not use such language. Miller admitted that he lost his temper, but he maintained that plaintiff had provoked him. Miller asked Battaglia if he wanted him to quit or to resign, but Battaglia said no.[9]

On Monday, April 23, Battaglia asked plaintiff what she wanted. Plaintiff told him that he could decide. Battaglia told plaintiff that Miller was very sorry about the incident, had apologized, had offered to quit and was willing to apologize directly to plaintiff. Plaintiff told Battaglia that she would not come back to work with Miller there. Battaglia told her that would be difficult. Battaglia explained

that Miller had simply lost his temper. Plaintiff told Battaglia that she wanted to keep her job, but that she did not feel that she could work under Miller because she would be in contact with him on every deal. She also told Battaglia that she thought Miller would treat her even more unfairly because of this incident. Battaglia told her to think about the situation for a couple of days. Later that day, plaintiff interviewed with Aristocrat Motors.

On Tuesday, April 24, plaintiff was still undecided whether to go to another dealership or stay with Baron—in part because of her client base. Plaintiff was in the middle of a lot of deals and on target to make approximately $100,000 for the year.[10] On April 24, plaintiff called Battaglia and asked whether there had been any changes and what was going to happen to Miller. Battaglia told her that Miller was an important part of the business and that Baron needed to keep him. Plaintiff responded, "obviously then I lose my job, a job I love and do very good at." Later in the conversation, Battaglia explained that "a car dealership is no place for a woman" and that he would not allow his daughter, sister, or mother to work in a car dealership because it is not a good environment.[11] Battaglia again asked plaintiff what she wanted and proposed a position with Baron Volkswagen or BMW used cars.[12] Plaintiff declined these alterna-

9. Battaglia believes that the circumstances under which plaintiff encountered Miller could have been humiliating to plaintiff and that Miller's conduct at the meeting and his comment to plaintiff were inappropriate. Battaglia testified, however, that at times, it may not be offensive to call a woman a fucking bitch.

10. In 2000 and 2001, the compensation plan and commission rates were the same for each salesperson. Martin, who started at Baron in 1994, has an average annual income of $60,000 which reflects sales of approximately 100 cars. Suarez, the finance director, has

an average annual income of $60,000. Kious, a college graduate, earned $86,000 during his first year. Griswold earned approximately $50,000 in 2002. Diaz, who has been employed at Baron for three years, earns an average annual income of $70,000. Salespeople who make $90,000 or more usually have been in the car business more than 20 years and have developed extensive customer bases.

11. Plaintiff testified that Battaglia probably also told her that he would not even want his son to work at a car dealership.

12. BMW used car salespeople generally earned less than new car salespeople. Bat-

tives. Plaintiff told Battaglia that her only choice was to leave.

Plaintiff reported to the EEOC that she left her job because of Miller and that she felt that she could not work under him daily—especially after he called her a fucking bitch in front of all the salespeople.[13] Baron fired Miller approximately four months after plaintiff left the dealership.

*Emotional Distress*

In June of 2001, plaintiff first visited Mike Hanson, a licensed clinical social worker. Plaintiff sought professional counseling because of "what happened at [Baron] BMW." Plaintiff's Depo. at 276. Hanson noted that plaintiff had severe psychosocial environmental stressors arising out of her job loss, previous domestic violence, her husband going to jail, parenting by herself, and severe conflicts with her daughter Whitney. Because of her job loss at Baron, plaintiff suffered extreme emotional distress. During a session with Hanson on July 12, 2001, plaintiff said that she had mixed emotions about going back to Baron and had thoughts and hope of going back to Baron. She was unhappy that she lost a job that she loved and she was worried about how to provide for her children. Hanson testified that plaintiff did not want to quit her job at Baron. According to Hanson, plaintiff presented to him with a "flight of ideas"[14] and pressured speech. He described her as a "chatterbox." Hanson originally diagnosed plaintiff with an adjustment disorder with depressed mood. He now believes that plaintiff's symptoms are more consistent with anxiety than depression. According to Hanson, plaintiff suffered from stress. Hanson also testified that irritable bowel syndrome could be caused by stress and anxiety.

*Procedural History*

On May 24, 2002, plaintiff filed suit against Baron. Her complaint alleges that (1) Baron maintained a hostile or abusive work environment based on sex (Counts I and II); (2) because of her sex, Baron gave her a phone which did not ring when a call was transferred to the general sales line, gave her a poor desk location, did not give her the same number of referrals as male salespeople, gave her a poor evaluation and allowed Miller to call her a fucking bitch at a sales meeting (Count III);[15] (4) by the above conduct, Baron intentionally inflicted emotional distress (Count IV); and (5) by the above conduct, Baron negligently inflicted emotional distress (Count V). Baron seeks summary judgment on all of plaintiff's claims.

taglia Depo. at 126. Some of the Volkswagen new car salespeople make the same amount as the BMW new car salespeople. *See id.* at 125. The average earnings of the BMW new car salespeople are "really close" to the earnings of the Volkswagen new car salespeople. *See id.* at 125–26.

**13.** Plaintiff told her daughter Whitney that she filed for sexual harassment against Miller. According to her daughter, plaintiff filed suit because Miller called her a fucking bitch.

According to her husband Brad Ammon, plaintiff's daughter Whitney has called plaintiff a "fucking bitch." According to Whitney, she has heard her mom use profanity, including the words "fuck" and "bitch." She has used the word "fuck" in her mom's presence, and she has referred to her mother using the word "bitch."

**14.** In other words, plaintiff was thinking of six, eight, ten things at once, but could necessarily organize or focus on one at a time.

**15.** Plaintiff has not opposed defendant's motion for summary judgment as to plaintiff's claims of disparate treatment based on (1) Miller's evaluation of plaintiff and (2) Miller's comment at the April 21, 2001 sales meeting. For reasons set forth in defendant's memorandum in support of its motion for summary judgment, the Court sustains defendant's motion on these two claims.

## *Analysis*

### I. Hostile Work Environment

■ Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a "hostile or abusive work environment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To establish a prima facie case of hostile work environment under Title VII, plaintiff must show that: (1) she is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. *Brandau v. State of Kansas,* 968 F.Supp. 1416 (D.Kan.1997).

■ To prevail under a hostile work environment theory, plaintiff must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.; see also Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The Court evaluates these factors from both a subjective and an objective viewpoint. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. The Court must consider not only the effect the discriminatory conduct actually had on plaintiff, but also the impact it likely would have had on a reasonable employee in plaintiff's position. *See Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998).

Defendant asserts that it is entitled to summary judgment because plaintiff has not shown that the conduct was unwelcome, that the harassment was sufficiently severe or pervasive to create an abusive working environment, or that liability can properly be imputed to defendant.

### A. *Unwelcome Conduct*

■ "In order to constitute harassment the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Bales v. Wal–Mart Stores, Inc.,* 143 F.3d 1103, 1108 (8th Cir.1998). The question is whether under the totality of the circumstances plaintiff indicated by her conduct that the alleged harassment was unwelcome. *Meritor,* 477 U.S. at 69, 106 S.Ct. 2399; *see Quick v. Donaldson Co.,* 90 F.3d 1372, 1378 (8th Cir.1996) (context is relevant, and may include such things as plaintiff's sexually provocative speech).

■ Defendant asserts that as a matter of law, the conduct was welcome because (1) according to Marlotte, plaintiff was a good friends with Fielder; (2) plaintiff shared Fielder's interest in adult content material in the workplace; (3) she maintained an affair with Battaglia; (4) after her affair was over, in Battaglia's office, plaintiff offered him money for sex; and (5) on one occasion, plaintiff discussed a

story about oral sex with Battaglia in the workplace. The Court disagrees.

First, the fact that plaintiff socialized with Fielder and appeared to be friends with him does not establish as a matter of law that plaintiff welcomed sexually offensive language and conduct by Fielder or others. As to plaintiff's interest in adult content material in the workplace, Baron cites no evidence for its assertion. Baron apparently relies on Battaglia's testimony that based on their reaction when he walked by Fielder's computer on a single occasion, Fielder and plaintiff were looking at something inappropriate. Such ambiguous testimony is insufficient to establish that plaintiff welcomed sexual comments and conduct by Fielder. The fact that plaintiff had an affair with Battaglia and engaged in sexual conversations with him in the workplace does not establish as a matter of law that her co-workers' conduct, discussed below, was welcome. *See Dobrich v. Gen. Dynamics Corp.*, 106 F.Supp.2d 386, 391 (D.Conn.2000) (though plaintiff was "no shrinking violet" and sometimes used foul language at job, she did not waive protections against unwelcome sexual harassment); *see also Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 963 (8th Cir.1993) (use of foul language or sexual innuendo in consensual setting does not waive plaintiff's legal protections against unwelcome harassment). Plaintiff also presented her affidavit which states that sexual conversations and comments about her physical appearance were unwelcome. In sum, plaintiff has presented sufficient evidence for a reasonable jury to find that the conduct of her co-workers, summarized below, was unwelcome.

**B.** *Hostile or Abusive Environment*

■ Whether a work environment is hostile or abusive is disjunctive, "requiring that the harassing conduct be sufficiently pervasive or sufficiently severe to alter the terms, conditions, or privileges of [p]lain-

tiff's employment." *See Smith v. Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir.1997). "The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir.1999). "[I]solated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct." *Northwest Fin.*, 129 F.3d at 1414; *see Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1175 (10th Cir. 1996) (one isolated comment and use of term "girlie" did not constitute pervasive harassment).

Plaintiff's evidence of a hostile work environment is that

1. On one occasion when plaintiff arrived to work carrying a Fairmont Hotel coffee cup, Miller asked her whether she had a good night at the Fairmont and then sneered and laughed. On another occasion, Miller asked plaintiff whether she had spent the night with a male customer who had been in the dealership the previous day. Miller also implied to others that plaintiff was engaging in sexual intercourse with co-workers.

2. Miller called plaintiff a "fucking bitch" at a sales meeting.

3. Miller and Battaglia told Fuller that plaintiff wanted to use them as sexual toys.

4. Battaglia called plaintiff "dolly" and "honey" in the workplace. Battaglia also told plaintiff that a car dealership is no place for a woman.

5. Sommerset frequently made comments to plaintiff such as "God, you look hot today" and "I'd love to lick those pants off of you."

6. Sommerset heard Fielder make sexual comments in the presence of plaintiff or about plaintiff about 20 times.

7. Dave Smith, a new car salesperson, asked plaintiff to climb up on the roof of a SUV so he could look at her in her skirt.

8. Levine frequently made comments about plaintiff's attire including associating her with a street walker or a school teacher.

9. Suarez heard comments of a sexual nature when plaintiff was in the used car sales area.

10. Fielder asked plaintiff for naked pictures of herself to show on the internet. Fielder had nude pictures of his girlfriend swimming and a picture of himself on the internet with his penis exposed. Fielder also showed plaintiff a photograph of a naked woman and asked her whether the picture turned her on.

11. On one occasion, Fielder told plaintiff to go look at a picture of another salesperson's wife naked on a computer. Plaintiff walked by the computer and said "is that really [his] wife?" When plaintiff saw Battaglia shortly thereafter, she said "Oh, my gosh, I can't believe they have [his] wife naked. I didn't know that she's on the Internet." Battaglia just "kind of looked and smiled."

12. On one occasion, Fielder asked plaintiff if Carolyn Marlotte, the receptionist, would be interested in seeing some pornographic videotapes. Plaintiff told him that she did not know so Fielder told her to go ask Marlotte. Plaintiff did so and reported back to Fielder that Marlotte was interested.

13. Kious testified that he heard Fielder have conversations of a sexual nature every week or two.

14. Conversations of a sexual nature were pervasive among the salesmen at Baron. Although Fuller did not ever witness plaintiff being sexually harassed, she observed examples of sexual harassment on a daily basis.

15. Diaz complained to Cohen about conversations with a sexual content that he heard about once a month. Kious testified that at Baron, employees use profanity on a daily basis and frequently engage in conversations of a sexual nature. Kious also testified that he heard Battaglia engage in conversations of a sexual nature once every couple of months where other salespeople and members of management were present.

■ In this case, plaintiff has produced evidence that Sommerset and Fielder made numerous offensive sexually suggestive comments to and about her during her entire nine-month tenure. In addition, other employees including Battaglia engaged in sexual conversations with other members of management and salesmen. Taken as a whole, the Court finds that all of the facts set forth above are sufficiently pervasive to create an objectively hostile work environment. *See Cadena v. Pacesetter Corp.*, 18 F.Supp.2d 1220 (D.Kan. 1998) (inappropriate sexual comments by supervisor, two of which were repeated on numerous occasions over a period of a few months, not isolated comments and could support jury finding of pervasive harassment); *cf. Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257 (10th Cir. 1998) (supervisor's conduct over period of several years, including taking plaintiffs to Hooters, requesting that plaintiffs work in

his hotel room, asking one plaintiff if she had wet dreams, asking one plaintiff what she was wearing under her dress, stating that a mall roof looked like a woman's breasts, trying to look down one plaintiff's blouse, and needlessly touching plaintiffs on many occasions not severe or pervasive enough to create hostile and abusive environment; vast majority of supervisor's behavior was motivated by poor taste rather than by plaintiffs' gender), *cert. denied,* 526 U.S. 1039, 119 S.Ct. 1334, 143 L.Ed.2d 498 (1999).

■ Although defendant contends that the behavior was not unwelcome, it does not specifically argue that plaintiff has failed to meet the subjective test, *e.g.,* that she has not presented sufficient facts to support a finding that she herself found the environment hostile. In any event, plaintiff has produced evidence from which a fact finder might reasonably conclude that she subjectively felt that Fielder and Sommerset had created a sexually hostile work environment. *See Harris,* 510 U.S at 21, 114 S.Ct. 367 (abusive work environment, even if it does not seriously affect employees' psychological well-being, offends Title VII's broad rule of workplace equality).

C. *Employer Liability*

■ Defendant argues that plaintiff has not identified a basis for imposing liability on Baron. Plaintiff apparently relies on the theory that Baron negligently responded to the hostile work environment at the dealership. Under Title VII, an employer may be held liable for hostile work environment sexual harassment committed by one employee against another if the employer negligently or recklessly fails to respond to the harassment. *See Hirschfeld v. N.M. Corr. Dep't,* 916 F.2d 572, 577 (10th Cir.1990). "This liability attaches when a plaintiff establishes that an employer had actual or constructive

notice of the hostile work environment and failed to respond adequately to that notice." *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1342 (10th Cir.1998). For purposes of Title VII, an employer is deemed to be on notice of a hostile work environment if management level employees know about the alleged harassment. *See Hirschfeld,* 916 F.2d at 577. A fact finder may infer that an employer had constructive knowledge of sexual harassment based on the pervasiveness of the harassment. *See Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 673 (10th Cir. 1998); *see also Baker v. Weyerhaeuser Co.,* 903 F.2d 1342, 1346 (10th Cir.1990); *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987); *Katz v. Dole,* 709 F.2d 251, 255 (4th Cir.1983).

■ Plaintiff has produced sparse evidence that she complained to management about any sexual remarks, but a fact finder could reasonably find that (1) based on the pervasiveness of such comments, Fuller's complaints, and the fact that management (including Battaglia) engaged in sexual conversations in the workplace, management had constructive knowledge of sexual harassment; and (2) management failed to respond adequately to that notice.

For these reasons, the Court overrules defendant's motion for summary judgment as to plaintiff's hostile work environment claim.

**II. Disparate Treatment**

■ Plaintiff claims that defendant discriminated against her on the basis of sex. Defendant contends that it is entitled to summary judgment because plaintiff cannot establish a prima facie case of disparate treatment. Plaintiff alleges that because of her sex, Baron (1) gave her a phone which did not ring when a call was transferred to the general sales line, (2) gave her a poor desk location (3) did not

give her the same number of referrals as male salespeople, (4) gave her a poor evaluation and (5) allowed Miller to call her a fucking bitch at a sales meeting.[16] As to each of these claims, plaintiff may demonstrate a prima facie case by showing that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.[17] *See Hysten v. Burlington N. & Santa Fe Railway Co.,* 296 F.3d 1177, 1181 (10th Cir.2002).

### A. Telephone System

Defendant makes several arguments as to plaintiff's claim related to the telephone system: (1) plaintiff has not shown that the telephone system caused any significant difficulties because she was on target to make $100,000 in her first year, (2) plaintiff made up for the phone problem through diligence by sitting near the front wall and the front door, (3) plaintiff has not shown that Marlotte did not give plaintiff her fair share of calls, and (4) the phone problems were not because of sex. Defendant does not explain how any of these arguments relate to plaintiff's prima facie case or the *McDonnell Douglas* burden shifting framework. The Court interprets defendant's first three arguments as one that the telephone system problems do not constitute adverse employment ac-

tion and the fourth argument as one that plaintiff has not shown that the adverse employment action occurred under circumstances which permit an inference of discrimination.

### 1. Adverse Employment Action

Defendant argues that plaintiff has not shown that the problems with her phone constitute adverse employment action. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Tenth Circuit liberally defines adverse employment action. *See Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 532 (10th Cir.1998). "Such actions are not simply limited to monetary losses in the form of wages or benefits." *Id.* Instead, the Tenth Circuit applies a "case-by-case" approach, examining the unique factors relevant to the situation before it. *Id.* Nevertheless, adverse employment action does not include "a mere inconvenience or an alteration of job responsibilities." *Id.* (citations and quotations omitted).

■ Plaintiff maintains that all new car salespeople except her received a portion of their sales through incoming

---

**16.** Plaintiff has not opposed defendant's motion for summary judgment as to plaintiff's claims of disparate treatment based on (1) Miller's evaluation of plaintiff and (2) Miller's comment at the sales meeting on April 21, 2001. For reasons set forth in defendant's memorandum in support of its motion for summary judgment, the Court sustains defendant's motion on these two claims.

**17.** Both parties cite *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1315–16 (10th Cir.1999) for the proposition that to establish a prima facie case, plaintiff must show that

she was treated less favorably than similarly situated male employees. Proof that similarly situated males are treated in a preferential manner is one way to meet the third element of a prima facie case but it is not necessarily the only way. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254 n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (prima facie standard is not inflexible; Supreme Court specification of prima facie proof required is not necessarily applicable in every factual situations); *Jones v. Denver Post Corp.,* 203 F.3d 748, 753 (10th Cir.2000).

phone calls on the general sales line. Although the receptionist attempted to ensure that plaintiff received a fair number of incoming calls, defendant has not shown that such efforts were successful. On this record, a reasonable jury could find that defendant's failure to correct plaintiff's telephone problems constituted adverse employment action.

### 2. Inference Of Discrimination

■ Plaintiff has shown that she was the only female salesperson and that until Kious in April of 2001, she was the only salesperson to have a phone which would not ring when the receptionist transferred a call to the general sales line. Defendant fixed Kious' phone within three or four months, but during her nine-month tenure, it never attempted to fix plaintiff's phone. Plaintiff's evidence is sufficient to raise an inference of discrimination so as to satisfy her prima facie case on her claim related to the telephone system.[18]

### B. Desk Location

■ Defendant argues that plaintiff's desk location does not constitute adverse employment action. The Court agrees. According to plaintiff, she never sat at her desk except to make phone calls and finalize paperwork with customers. Plaintiff ordinarily sat or stood near the front door so that she could greet customers as they walked into the dealership. Plaintiff's desk assignment was preferable to the desk assignments of several male salespeople. Although plaintiff was unhappy with the location of her desk at first, she concedes that the location was advantageous because it was near the front door. Plaintiff even requested that defendant not move her desk. In sum, plaintiff has not

shown that she suffered negative consequences because of her desk location, *see* *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir.1994) (plaintiff must show adverse action relating to evaluation); *Dunlap v. Kan. Dept. of Health & Env't*, 211 F.Supp.2d 1334, 1343 (D.Kan. 2002) (letter of reprimand without negative consequences not adverse action), or that her desk assignment materially altered the terms and conditions of her employment, *see Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857–58 (10th Cir.2000) (moving plaintiff's desk to different locations does not constitute adverse employment action); *Clary v. Marley Cooling Tower Co.*, 1997 WL 150048, at *5 (D.Kan. Mar. 12, 1997) (cubicle assignment not "materially adverse" change in terms and conditions of employment despite plaintiff's assertion that it was too dark for her to work effectively). The Court therefore sustains defendant's motion for summary judgment on plaintiff's disparate treatment claim based on desk location.

### C. Referrals

■ Plaintiff alleges that because of her sex, she did not receive sales through referrals from managers. Defendant argues that plaintiff's receipt of referrals does not constitute adverse employment action. Neither party has provided detailed evidence as to referrals. Kious and Martin received sales through referrals from their managers. Plaintiff received one referral from her supervisor, Miller, but she never received *sales* through referrals from her managers. Defendant argues that referrals were not entitlements for employees who performed satisfactorily, and that management randomly directed referrals based on convenience. Defen-

---

**18.** Baron alludes to a potential explanation for the telephone problems, *i.e.* it moved into a new building the same month plaintiff was hired. Baron provides no evidentiary support for its assertion. Moreover, Baron does not explain why it never attempted to fix the problem with plaintiff's phone during her nine-month tenure.

dant provides no evidentiary support for its contention. Moreover, to the extent that management only gave referrals to male salespeople, such conduct could constitute adverse employment action. *See Burlington,* 524 U.S. at 761, 118 S.Ct. 2257 (tangible employment action includes decision causing a significant change in benefits). Based on the sparse record, the Court must overrule defendant's motion for summary judgment on plaintiff's disparate treatment claim based on referrals.

### III. Constructive Discharge

 An employee who is not formally discharged from employment may still be constructively discharged if the employer, by its illegal discriminatory acts, has made working conditions so difficult that a reasonable person in plaintiff's position would feel compelled to resign. *See Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986). "Essentially, a plaintiff must show that she had 'no other choice but to quit.'" *Yearous v. Niobrara County Mem'l Hosp.,* 128 F.3d 1351, 1356 (10th Cir.1997) (quoting *Woodward v. City of Worland,* 977 F.2d 1392, 1401 (10th Cir. 1992)). The conditions of employment must be objectively intolerable; plaintiff's subjective views of the situation are irrelevant. *Sanchez,* 164 F.3d at 534.

 Defendant argues that it is entitled to summary judgment on plaintiff's constructive discharge claim because plaintiff quit before Battaglia had explained the details of an offer to transfer her to Baron Volkswagen. Plaintiff asserts that the transfer to Baron Volkswagen was a demotion, but she offers no evidence to support her assertion. *See Plaintiff's Memorandum In Opposition Of Defendant's Motion For Summary Judgment* (Doc. # 102) filed April 24, 2003 at 44. Plaintiff concedes that some of the Volkswagen new car salespeople make the same amount as the BMW new car salespeople and that the

average earnings of the two groups of salespeople is "really close." Plaintiff has not shown that the new position would have been a demotion. More importantly, plaintiff has not offered any evidence from which a reasonable jury might conclude that the position at Baron Volkswagen would have been objectively intolerable. Accordingly, the Court sustains defendant's motion for summary judgment on plaintiff's constructive discharge claim. *See Garrett v. Hewlett Packard Co.,* 305 F.3d 1210, 1222 (10th Cir.2002) (summary judgment appropriate where evidence did not raise inference that plaintiff had no other choice but to resign; plaintiff resigned before he had complete details as to new position); *Buchanan v. Sherrill,* 51 F.3d 227, 229 (10th Cir.1995) (where plaintiff refuses transfer out of objectionable environment, no reasonable jury could find that plaintiff had no choice but to quit); *Singer v. Denver Sch. Dist. No. 1,* 959 F.Supp. 1325, 1334 (D.Colo.1997) (summary judgment appropriate where plaintiff did not show that option of continued employment at another location would have been objectively intolerable); *see also Marrero v. Goya of P.R., Inc.,* 304 F.3d 7, 25 (1st Cir.2002) (not enough that plaintiff felt stigmatized and punished by transfer; more tangible change in duties or working conditions required before transfer can be considered as demotion); *James v. Sears, Roebuck & Co., Inc.,* 21 F.3d 989, 993 (10th Cir.1994) (reassignment is not demotion unless employee can show that new position has less pay, has less responsibility, or requires lesser degree of skill than previous position); *Sauer v. McGraw–Hill Cos., Inc.,* 2001 WL 1250099, at *13 (D.Colo. June 12, 2001) (plaintiff's perceived demotion falls woefully short of establishing constructive discharge).

### IV. Tort Of Outrage

 Defendant argues that it is entitled to summary judgment on plaintiff's

claims of intentional infliction of emotional distress (the tort of outrage). Kansas law requires plaintiff to demonstrate that (1) defendant's conduct was intentional or in reckless disregard of plaintiff; (2) defendant's conduct was extreme and outrageous; (3) a causal connection exists between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress was extreme and severe. *Roberts v. Saylor,* 230 Kan. 289, 292, 637 P.2d 1175, 1179 (1981). The Kansas Supreme Court has established two threshold requirements which must be satisfied, and which the Court must determine as a matter of law. *Id.* First, the Court must ascertain whether defendant's conduct may be reasonably regarded as so extreme and outrageous as to permit recovery. *Id.* If so, the Court then determines whether the emotional distress suffered by plaintiff is so severe that no reasonable person should be expected to endure it. *Id.* If plaintiff's claim fails either of these threshold requirements, the claim will not survive summary judgment.

 To declare that defendant's conduct may be regarded as "extreme and outrageous," the Court must conclude that defendant's behavior meets the following standard:

> Liability may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. It was further said that liability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, "Outrageous!" It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expression, or other trivialities. Members of

the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt .... Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society.

*Roberts,* 230 Kan. at 293, 637 P.2d at 1179.

Defendant argues that plaintiff cannot satisfy either of the two preliminary requirements of an outrage claim: (1) that defendant's conduct was so extreme and outrageous as to permit recovery and (2) that plaintiff's emotional distress is so severe that no reasonable person should be expected to endure it.

 As to the first requirement, Kansas courts have been extremely reluctant to extend actions for outrage to employment discrimination and sexual harassment claims. *See Bolden v. PRC Inc.,* 43 F.3d 545, 554 (10th Cir.1994), *cert. denied,* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995); *Schartz v. Unified Sch. Dist. No. 512,* 953 F.Supp. 1208, 1221 (D.Kan.1997); *Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 501 (D.Kan.1994); *Laughinghouse v. Risser,* 754 F.Supp. 836, 843 (D.Kan.1990). A hostile work environment sufficient to support a Title VII claim does not necessarily require a finding of outrageous conduct. *See, e.g., Varley v. Superior Chevrolet Auto. Co.,* 1997 WL 161942, at *16 (D.Kan.1997); *Anspach v. Tomkins Indus., Inc.,* 817 F.Supp. 1499, 1507 (D.Kan.1993), *aff'd,* 51 F.3d 285, 1995 WL 133385 (10th Cir.1995). Kansas courts have rarely found conduct to be sufficiently outrageous to survive summary judgment, and those claims which

have survived involved highly shocking and egregious conduct such as repeated physical threats and racially or sexually abusive language.[19] *See Lawyer v. Eck & Eck Mach., Co., Inc.,* 197 F.Supp.2d 1267, 1276–77 (D.Kan.2002); *Ratts v. Bd. of County Comm'rs, Harvey County, Kan.,* 141 F.Supp.2d 1289, 1322 (D.Kan.2001); *Land v. Midwest Office Tech., Inc.,* 114 F.Supp.2d 1121, 1144 (D.Kan.2000).

In evaluating whether plaintiff has alleged conduct which is sufficiently outrageous to survive summary judgment, the Court notes that plaintiff has alleged numerous acts of misconduct by non-supervisory employees such as Fielder and Sommerset and asserted that these acts are sufficient to show that Baron's conduct was outrageous. Baron is not vicariously liable, however, for the intentional acts of its salespeople—plaintiff's co-workers. *See Bolden,* 43 F.3d at 553–54; *Farris v. Bd. of County Comm'rs of Wyandotte County, Kan.,* 924 F.Supp. 1041, 1050–51 (D.Kan.1996); *Anspach,* 817 F.Supp. at 1506, *aff'd,* 51 F.3d 285 (10th Cir.1995); *Meininger v. Swift–Eckrich, Inc.,* 1995 WL 42700 (D.Kan.1995). Accordingly, the Court examines only whether the conduct of the company, including its response to the sexually abusive comments, was extreme and outrageous.

Although defendant may have been on constructive notice of a sexually hostile work environment, plaintiff rarely complained of sexual comments by her co-workers. A reasonable jury certainly could find that Baron operated a distasteful and sexually hostile work environment and that it negligently responded to the offensive environment. Baron's conduct, however, cannot reasonably be described as "atrocious and utterly intolerable in a civilized society." *Roberts,* 230 Kan. at 293, 637 P.2d at 1179; *see Anspach,* 817 F.Supp. at 1506–07 (woefully inadequate attempt to stop harassment not outrageous); *Meininger,* 1995 WL 42700, at *5 (failure to remedy co-worker sexual harassment not outrageous); *West v. Boeing Co.,* 843 F.Supp. 670, 678 (D.Kan.1994) (failure to adequately investigate sexual harassment charges not outrageous). In addition, the Court finds that many of the sexually charged comments by plaintiff's co-workers fall into the category of "mere insults, indignities, threats, annoyances, petty expressions, or other trivialities," *Roberts,* 230 Kan. at 293, 637 P.2d at 1179, which is confirmed by the fact that plaintiff did not complain about the comments. Plaintiff did complain to management about Martin's threat to have her fired, but she concedes that Martin made the threat because plaintiff interrupted him. After plaintiff reported the incident, Miller talked to Martin. Plaintiff did not complain of any further inappropriate conduct by Martin. The fact that Miller lost his temper and called plaintiff a fucking bitch on a single occasion also is insufficient.

---

**19.** *See, e.g., Taiwo v. Vu,* 249 Kan. 585, 593, 822 P.2d 1024 (1991) (defendant assaulted, battered, falsely imprisoned, falsely accused, and induced an employee to falsely accuse plaintiffs); *Gomez v. Hug,* 7 Kan.App.2d 603, 604–05, 645 P.2d 916 (1982) (employer verbally accosted employee with vulgar racial slurs, grossly offensive insults, and intense threats of violence over period of several days); *Oliphant v. Perkins Rests. Operating Co.,* 885 F.Supp. 1486, 1489–90 (D.Kan.1995) (supervisor repeatedly cursed at and threw objects at employee for a year and berated her at home with daily phone calls when she was pregnant and on medical leave); *Bernard v. Doskocil Cos., Inc.,* 861 F.Supp. 1006, 1015 (D.Kan.1994) (racial slurs, pranks and threat to throw flammable rag around plaintiff's neck while he was welding); *Laughinghouse,* 754 F.Supp. at 843 (defendant continually harassed plaintiff over two-year period, including screaming and cursing, unwanted touchings and sexual comments, and fits of rage which included throwing things and tearing up files, because plaintiff would not sleep with defendant).

After plaintiff reported the incident to Baron management, Battaglia offered to transfer her to a new location but she declined. Baron told plaintiff that a car dealership was no place for a woman, but in context of his offer to transfer her, such a comment amounts to merely a rude and insulting comment, not outrageous conduct. In sum, Baron's conduct, including its response to plaintiff's complaints and its failure to eradicate the sexual context of the workplace, is insufficient to support a finding of outrageous conduct under Kansas law. Therefore the Court sustains defendant's motion for summary judgment on plaintiff's outrage claim.[20]

## V. Negligent Infliction Of Emotional Distress

■ Plaintiff alleges that by maintaining a hostile work environment based on sex and treating her differently because of sex, Baron negligently inflicted emotional distress. Defendant argues that it is entitled to summary judgment on plaintiff's claim because (1) Kansas law does not recognize such a claim where the underlying conduct is sexual harassment by co-workers and (2) plaintiff cannot show that her emotional distress caused or was accompanied by physical injury. The Court need not address defendant's first argument because plaintiff's evidence of physical injury is woefully inadequate.

■ Under Kansas law, absent physical injury, plaintiff cannot recover for negligent infliction of emotional distress. *See Humes v. Clinton,* 246 Kan. 590, 598, 792 P.2d 1032, 1037 (1990); *Land,* 114 F.Supp.2d at 1145. Plaintiff states that she suffered physical injuries including irritable bowel syndrome ("IBS") because of "defendant's actions." *See* Pl.'s SOF ¶ 58.

In support, plaintiff cites the following testimony by Mike Hanson, a licensed clinical social worker:

Q: So you wouldn't exclude a numerical diagnosis of 309? You would add anxiety to it? Correct?

A: I could add, though I have not, a diagnosis of—of anxiety. Again, it would depend on when I talked to her, how long that anxiety had been going on, as to whether or not it would mean adjustment disorder with mixed emotions, primarily anxiety, or anxiety disorder. The irritable bowel, medical piece, could be attributed to stress and anxiety. It often is.

Hanson Depo. at 73. The above testimony is ambiguous and insufficient to establish that plaintiff suffered IBS because of defendant's conduct during her employment. More importantly, Hanson is a Kansas licensed clinical social worker. He can diagnose mental disorders, but not physical problems such as IBS. *See* K.S.A. § 65–6306(d)(2) (licensed clinical social worker may engage in social work practice and diagnose and treat mental disorders); K.S.A. § 65–6320 (disclosure to client must include statement that social worker is not authorized to practice medicine or prescribe drugs).

■ Even if Hanson could diagnose IBS and he actually did so in plaintiff's case, plaintiff has not cited evidence that stress and anxiety from her work at Baron caused her condition. *See Hoard v. Shawnee Mission Med. Ctr.,* 233 Kan. 267, 277, 662 P.2d 1214, 1221 (1983) (plaintiff must show that physical injuries were direct and proximate result of emotional distress caused by defendant's alleged negligence).

---

**20.** Because the Court finds that plaintiff cannot satisfy the first threshold requirement of an outrage claim, it need not address defendant's argument that plaintiff cannot show that she suffered such severe emotional distress that no reasonable person should be expected to endure it.

Plaintiff maintains that "defendant's actions" caused her stress, anxiety and severe emotional distress, *see* Pl.'s SOF ¶¶ 53–54, but the cited testimony establishes only that plaintiff's "job loss" caused her stress and anxiety. *See* Plaintiff's Depo. at 301–04; Hanson Depo. at 42–43, 55. Nothing in the cited testimony suggests that disparate treatment or a hostile work environment caused plaintiff's distress or that she experienced stress and anxiety before her job loss.[21]

For these reasons, the Court sustains defendant's motion for summary judgment on plaintiff's claim for negligent infliction of emotional distress.

**IT IS THEREFORE ORDERED** that the *Motion For Summary Judgment Of The Defendant The Baron Automotive Group* (Doc. # 96) filed April 4, 2003 be and hereby is **SUSTAINED in part.** The motion is sustained as to (1) the disparate treatment sexual discrimination claim based on plaintiff's desk location, Miller's evaluation of plaintiff and Miller's comment at the sales meeting on April 21, 2001, (2) plaintiff's claim for constructive discharge, (3) plaintiff's claim for outrage, and (4) plaintiff's claim for negligent infliction of emotional distress. The motion is otherwise overruled.

---

**21.** Indeed, plaintiff testified that she loved working at Baron, *see* Plaintiff's Depo. at 301–02 ("I loved working there," "I loved my job," "it was something I loved doing"); *see also* Hanson Depo. at 42 (plaintiff said she had job she really liked).