Ora FREEMAN, Plaintiff,

v.

SPENCER GIFTS, INC., Defendant.

No. CIV.A. 03–2229–KHV.

United States District Court,
D. Kansas.

Aug. 25, 2004.

1023, 1027 (10th Cir.1994).

Steven D. Horak, Overland Park, KS, for Plaintiff.

Donald S. Prophete, Michael L. Matula, Armstrong Teasdale LLP, Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Ora Freeman brings suit against Spencer Gifts, Inc. ("Spencer Gifts") alleging a racially hostile work environment, disparate treatment on the basis of race and retaliation for engaging in protected activity, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* as amended. This matter comes before the Court on *Defendant's Motion For Summary Judgment* (Doc. # 38) filed June 1, 2004. Defendant seeks summary judgment on each of plaintiff's claims. For reasons stated below, the Court finds that defendant's motion should be sustained in part.

#### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law. Rule 56(c), Fed.R.Civ.P.; *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *See Applied Genetics,* 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment. *See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.

*See Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### Facts

The following facts are either uncontroverted or construed in a light most favorable to plaintiff.[1]

Spencer Gifts is a national retail store which sells novelty gifts. In August of 1999, Spencer Gifts hired plaintiff, an African–American woman, as a management trainee. In August of 2000, Freeman relocated from Texas to Kansas to become area manager for the Kansas City stores. Freeman was responsible for managing a store at Oak Park Mall, and for overseeing the operations of three other stores in Independence, Missouri, and Olathe and Topeka, Kansas.

As area manager, plaintiff's responsibilities included operating the Oak Park store at a level to receive "top marks" and being an example to other store managers. She trained other store managers who reported to her.

Regional managers supervise district managers, and district managers supervise area managers. In November of 2000, Joseph Goodfellow became district manag-

---

1. The Court does not consider facts which defendant includes for the first time in its reply brief. *See, e.g., Oleson v. Kmart Corp.,* 189 F.R.D. 636, 637 (D.Kan.1999) (unfair to non-movant for court to consider facts which appear for first time in reply brief). In addition, the Court does not consider facts which are not contained in the parties' statement of facts. *See* D. Kan. Rule 56.1.

er for plaintiff's stores. Goodfellow reported to regional manager Jerry Marfisi. Regional managers such as Marfisi report to the vice president of operations, Ken Garagiola.

Freeman rode in a car with Goodfellow on many work-related trips. On more than ten occasions, Goodfellow played rap music with the word "nigger" in it. He told plaintiff that he played the music so that he could "relate" to her. Once, Goodfellow told plaintiff that he did not understand how black people can call each other "nigger" but get upset when white people use the word. He also told plaintiff that the name of the group which sang the music was "Niggas With Attitude," a nationally known rap band. He emphasized to plaintiff that the word was "nigga," not "nigger."[2] Plaintiff told Goodfellow that the word was offensive in either case and that she did not want to listen to vulgar, racist music. Goodfellow did not turn the music off right away.[3] Goodfellow told plaintiff that he and some friends drove around playing that music and asked plaintiff: "Can you imagine how the brothers feel when they see a bunch of white guys riding around in their car listening to this type of music?" Freeman Depo. at 15–16, Ex. 3 to *Defendant's Memorandum In Support Of Motion For Summary Judgment* (Doc. # 39) filed June 2, 2004.

Goodfellow played the music once while another black employee, Byon Arceneaux, was in the car. Before plaintiff got in the car, Goodfellow told Arceneaux that the music was going to upset plaintiff. Plaintiff refused to get into the car until Goodfellow turned off the music. Goodfellow did so but then put the CD back on.

Goodfellow used terms such as "you people" or "brother" to refer to blacks. He sometimes told plaintiff that there was no food for her to eat because there was no chicken. On one occasion, Goodfellow referred to an African–American woman as a "black gal."

Goodfellow refused to shake plaintiff's hand when he met her. He hugged other employees and shook their hands. During a meeting at a store in Wichita in front of several other employees, Goodfellow asked Freeman to run to his car to "fetch" a bag.

Goodfellow allowed another employee, Debbie Stone, to take two weeks off when she injured her back. When plaintiff asked for time off to seek treatment for uterine cysts, however, Goodfellow told her that Halloween was not a good time to be off because that was Spencer Gift's busiest season. Even though he was aware of plaintiff's medical condition, Goodfellow required her to move boxes from a store to a truck. Further, when Stone traveled on company business, Goodfellow made sure she had a hotel room and was "fully taken care of." On the other hand, Goodfellow did not ensure that plaintiff had a hotel room or car when she traveled on business.

Goodfellow would order Freeman to get him coffee in a demeaning manner, and did not ask other employees to get him coffee. Plaintiff testified that he treated her in a gruff manner but treated all other managers in a friendly manner. He would give them pats on the back and mingle with them.

When plaintiff went to Hutchinson, Kansas to help close down a store, Goodfellow told her that the Hutchinson store manag-

---

**2.** Plaintiff found the word "nigger" to be discriminatory because she was raised in the late 1960s and early 1970s. She went to a predominantly white school and crosses were burned on the football field.

**3.** The music also contained the words "bitch" and "whore."

er would drive her to and from the mall. The manager was not able to do so, however, and plaintiff had to walk to and from the hotel to the mall in the snow and developed pneumonia.

At a manager's meeting in plaintiff's store, Goodfellow required plaintiff to give up her chair to another employee during a meeting. She felt this was demeaning. At another meeting with store managers, Goodfellow excluded plaintiff from sitting with other employees at lunch. He told her to go sit "back there."

When Freeman considered hiring two African–American women, Goodfellow asked whether they "were the right kind of people for the mall," and she decided not to hire them because she did not want to go "tit for tat" with Goodfellow.

In August 2001, Freeman hired Byon Arceneaux, an African–American, as store manager at Independence Center. When Goodfellow came back from meeting Arceneaux, he told plaintiff that people like Arseneaux do not work out. When another employee accused Arceneaux of sexual harassment, Goodfellow wanted plaintiff to fire Arceneaux. Goodfellow did not fire a white store manager whom five employees accused of sexual harassment.

Arceneaux saw Goodfellow and plaintiff interact on many occasions, at meetings and during store visits. He stated that he thought they had "personality conflicts" and that "they were both stubborn people" who "bumped heads." *See* Defendant's Ex. 21 at 10–11.

Freeman was the only area manager whom Goodfellow supervised. His duties included training plaintiff, but she testified that he "utterly failed to train her." Specifically, plaintiff testified that a "phase II" area manager received training including how to use a laptop computer, how to evaluate yearly financial figures, and how to break down payroll for each store, but she received no such training. Goodfellow did not provide plaintiff much feedback, and he did not show her any team progress reviews.

### Plaintiff's Complaint of Discrimination And Defendant's Response

In January of 2002, plaintiff attended a manager's meeting in St. Louis, Missouri. On January 29, 2002, plaintiff met with Garagiola, vice president of operations, to complain about Goodfellow. Specifically, plaintiff complained to Garagiola that (1) at the Oak Park store, Goodfellow showed her 16–year–old son a pornographic website (Goodfellow did not show the web site to two white employees who were also in the store); (2) while plaintiff was in Goodfellow's car on work-related trips, he played rap music which used the term "niggers;" (3) Goodfellow used the term "nigger" in her presence; and (4) Goodfellow told plaintiff to "fetch" a bag and carry it. Garagiola told plaintiff that he would talk to human resources, that Spencer Gifts would probably conduct an investigation and that human resources would notify plaintiff about the investigation.

On February 4, 2002, Tony Matire, director of human resources, and Mike Dybicz, operations director, spoke with plaintiff by phone at 5:10 p.m. They had heard that she was having problems with Goodfellow and asked to discuss the issue. Plaintiff told Matire that Goodfellow had given her an evaluation earlier that day and that she did not think it was a fair evaluation. She told Matire that Goodfellow did not provide her good guidance, did not treat her with dignity, and at times treated her like a "flunky." She also told him that Goodfellow had listened to rap music in her presence and that she found it offensive. She gave Matire the names of individuals who had witnessed the conduct of which she complained, including Arceneaux, Malissa Davis, Adam Grosser, Scott Hayes and Joe Gendreau. Matire asked plaintiff to send her complaints in

writing. That same day, Matire contacted Marcia Wilken, regional human resources manager, to assist in an investigation. That evening, Wilken checked the schedules for store managers in plaintiff's area and the assistant manager at plaintiff's store so she could interview them.

The following day, February 5, 2002, Wilken interviewed several employees who worked with Goodfellow and plaintiff. During the interviews, she asked the employees to write out statements about what they knew of interactions between Goodfellow and plaintiff.

Arceneaux stated that on his second day with the company, Goodfellow placed a "pretty offensive" CD in his car, that plaintiff was obviously offended by the music, and that Goodfellow eventually turned it off. Arceneaux stated that he was "pretty sure" that Goodfellow played it to "tick off" plaintiff. He stated, "I honestly don't think that Joe is setting out to be offensive or intimidating, but that [ ] is his personality. I think that Joe and Ora just have personality conflicts that need to be addressed. [ ] He does things like tell her to go get him a coffee. He never asks anyone but Ora to do this and it is in a demeaning way.[ ] He knows this offends her, but he still does it." Defendant's Ex. 17, Arceneaux statement.

On February 6, 2002, Freeman faxed to Dybicz and Matire a written statement of her complaints about Goodfellow. She did not expressly state that she believed that Goodfellow's conduct was motivated by race. She stated as follows:

Since Goodfellow has been in this district I have under gone [sic] some enormous pain and suffered embarrassment. I am having trouble even repeating these events, but never the less I feel it is very important to let you all know why I chose to keep silent about the situation. I am the sole supporter of my family and I did not want to make a bad situation worse by telling anyone the situation of Joe and myself. [ ] Since I now have no choice I have to tell the truth.

Defendant's Ex. 17, Freeman e-mail.

Plaintiff's statement then set out four incidents which, highly summarized, included:

(1) On December 2000, Goodfellow showed plaintiff's son a pornographic web site in the stock room. Plaintiff yelled at Goodfellow not to show her son the site, and she asked her son to leave.

(2) Defendant told plaintiff that he needed her to close down the Christmas store in Hutchinson, Kansas. Goodfellow told plaintiff that the Hutchinson store manager would give her a ride to and from the mall. The manager was not able to provide rides, however, and plaintiff had to walk to and from the hotel to the mall in the snow and developed bronchitis and pneumonia.

(3) At a district meeting in St. Louis some employees went to a bar and drank heavily. One of them bragged about sleeping with the district manager. Plaintiff was not at the bar. The next day, Goodfellow told plaintiff that he heard that plaintiff had started this rumor. Plaintiff told him that she did not, and that she was in her room that night.

(4) When Goodfellow was in a car with plaintiff coming back from a store visit, he put in a CD called "Die Motherfucker Die" sung by the group "N.W.A." which stands for "Niggas With Attitudes." Plaintiff asked Goodfellow to turn off the music and he told her that she should lighten up.[4]

---

4. Plaintiff stated in her written statement that "I refuse to listen to any music that refers to women as 'Bitches and Whores.' "

In her concluding paragraph, plaintiff stated:

Joe Goodfellow has created a hostile, stressful working environment. If you think that I'm overacting [sic] think about letting your family see that web site. I feel that Joe has never helped my career he hasn't even went over the area managers journal with me. Instead I am treated like an errand girl to fetch books and bags[.] Gentlemen I can be what Spencer's wants me to be if given the proper chance and instruction.

The end of the statement had a handwritten sentence signed by plaintiff: "I really would hope that you would listen to the C.D. and review that web site."

On February 7, 2002, Wilken spoke with other store managers who had seen Goodfellow and plaintiff interact at managers meetings. Wilken e-mailed Dybicz and Matire the information which she received from these managers. Between February 8 and 11, 2002, Matire interviewed several store managers by telephone. All together, Matire and Wilken interviewed 16 people in addition to plaintiff and Goodfellow. Based on the interviews and other information, Matire concluded that Goodfellow and plaintiff had different management styles, that Goodfellow was a "by-the-book" person who liked his stores run a certain way and that plaintiff did not see it the way he did. Matire did not believe that Goodfellow's behavior toward plaintiff, including his negative evaluation of her performance and decision to demote her on February 4, 2002 (discussed below), was motivated by race.[5]

Goodfellow also received training on Spencer Gift's anti-harassment and discrimination policy. During her employment, plaintiff also received training on how to report "any type" of discrimination or harassment to management. She re-ceived training on how managers were to handle sexual harassment complaints, including a packet titled "Sexual Harassment In The Workplace." The packet began with a statement that Spencer Gifts has always been committed to providing a working environment free of discrimination and harassment. The statement went on: "To emphasize our concern regarding the latter, we have issued a separate policy statement prohibiting unlawful harassment, including but not limited to sexual harassment. If you believe that you have been the subject of harassment, please contact your supervisor immediately. If this is not appropriate, please use our toll free hotline (1–800–284–4737)." Defendant's Ex. 23. Plaintiff did not believe and was not trained that defendant's policy for racial harassment was the same as the policy for sexual harassment.

### *Plaintiff's Demotion And Resignation Or Termination.*

Area managers are evaluated on the performance of the stores in their area. Defendant completes yearly performance evaluations of store managers and area managers. In addition, district managers complete "team progress reports" based on store visits, and they review the performance of store managers and area managers. Defendant also evaluates store managers and area managers based on "asset management evaluations," or audits. A special in-house independent audit department conducts an in-depth paperwork review of the store and checks compliance with all policies, procedures and bank deposits and also assesses the "shape" of a store. Spencer Gifts was supposed to provide team progress reports and audits to employees, but it did not provide them to plaintiff. Until February of 2002, Spencer

---

**5.** For a detailed description of Goodfellow's evaluations of plaintiff and the decision to demote her on February 4, 2002, see the discussion, *infra.*

Gifts never told plaintiff that she had performance problems.

On May 30, 2001, defendant's audit department audited plaintiff's store and rated it as "Improvement Required." *See* Defendant's Ex. 4.[6] No one at Spencer Gifts ever provided plaintiff the results of the audit. Defendant contends that on June 27, 2001, Goodfellow completed a team progress report on plaintiff's store and rated it as "Improvement Required." *See* Defendant's Ex. 5. Prior to discovery in this case, plaintiff had never seen the team progress report of June 27, 2001, and she alleges that the document is fraudulent. Defendant has also produced a team progress report which Goodfellow purportedly completed on August 7, 2001. It rated plaintiff's store as "Acceptable" but noted more than 15 improvement requirements and one rating of "Unacceptable." *See* Defendant's Ex. 6. Plaintiff never saw this document until discovery in this lawsuit and she asserts that it is fraudulent.

As evidence that the team progress report documents are "fraudulent," plaintiff points to her testimony that she never made the statements which are typewritten on each of these documents. She also notes that each report attributes the same statements to her, *i.e.* under Manager's Comments: "This Team Progress Report has been reviewed with me. I understand all points and will correct any [improvement required] or [unacceptable] requirements within 10 days after this visit unless noted above." The documents have a space for the manager's signature, but they are not signed.

On August 21, 2001, plaintiff completed and returned to the human resources department a "Progress Feedback Questionnaire" with questions to help human resources assess her position in the area manager program. *See* Defendant's Ex. 7. In response to the question, "Describe the feedback/support your DSM (i.e., District Sales Manager) has given you," plaintiff wrote: "My D.S.M. has given nothing but positive feedback. We have a conference call on Mondays and Fridays to discuss any concerns or any problems that I may have. The best lesson learned was to lead with my head and not with my heart. To go by company policy always." In response to the question, "What specific areas do you need additional training?" plaintiff wrote, "If asked this question three months ago I would have said follow up, and delegations, but now I [have] overcome both and now I'm concentrating on helping new manager[s] of which I have three, think outside the box with motivating their sales team, and managing our sales plan." In response to the question asking, "Describe the feedback you have received and from whom," plaintiff wrote, "I have received positive feed back from my D.S.M. and my regional manager. I really have come to respect my D.S.M.'s outlook on multi-store management." Plaintiff adds, however, that she answered the questionnaire during a seminar in which the leaders instructed her to write only positive statements. She testified that she answered the questions as prompted by the seminar leaders to give positive feedback and "not call her manager a big fat racist." Freeman Depo. at 184–186.

On November 21, 2001, after a visit to plaintiff's stores, regional manager Marfisi

---

**6.** Plaintiff testified that until discovery in this case, she never had seen the audit of May 30, 2001. In her response to defendant's motion for summary judgment, she asserts that Goodfellow or defendant "made up" this document. She notes that the loss prevention on May 8 was listed as 3.94, but that the number on June 27, 2001 was 1.6. She states that shrinkage cannot change that quickly, and that there is no question that the numbers are "bogus and lies."

reported to vice-president Garagiola that plaintiff's personal store "from a look point of view is good but operational not strong she had an improvement required audit, and as an area manager is most likely over her head and Joe is not getting the performance he needs [sic] an area manager. ..." Defendant's Ex. 8. Plaintiff testified that Marfisi's report was based a "fraudulent document"—she asserts that Goodfellow never showed her the audit with an "improvement required" rating, and never told her that she was not doing a good job. At some point, Marifisi told plaintiff that she was doing a great job in how she made the store look. In late fall or early winter, 2001, Goodfellow, Dybicz and Jerry Marfisi decided to remove plaintiff from her area manager position but let her remain as store manager at Oak Park. Goodfellow decided to allow plaintiff to go through the holiday season to see if she could improve. Defendant does not provide a specific date when it decided to remove plaintiff from the area manager position, but it did not tell her of the demotion until February 4, 2002.

On February 4, 2002, the Monday after plaintiff complained to Garagiola about Goodfellow's conduct, Goodfellow and Marfisi went to plaintiff's store to do her evalua-tion. They told her that they were not happy with her progress and that they were taking her out of the area manager program. They did not give her a written job evaluation. Goodfellow testified that on that date, he did not know about plaintiff's complaint to Garagiola. The demotion meant that plaintiff would lose money and be ineligible to become a district manager. Plaintiff felt humiliated by the demotion. She told Goodfellow and Marfisi that she would quit, and she started to write her resignation on a lined piece of paper. Marfisi told her he did not want her to quit, however, and told her to take a couple of weeks to think about it. Marfisi also told plaintiff that he would like her to continue to manage the Oak Park store, but she told him that she did not think she could do that. Plaintiff left her resignation on her desk and did not give it to any of defendant's agents.

Defendant has produced a document which it asserts is a copy of a written job evaluation which Goodfellow and Marfisi gave plaintiff on February 4, 2002. *See* Defendant's Ex. 24. The document includes four paragraphs of narrative comments about plaintiff's performance and a "comments" section with the handwritten statement:

*I feel like this was a totally unfair evaluation, I feel there was no support from my DSM at all. I will resign my Position as of 2–25–02.*

s/ Ora Freeman

x Ora Freeman 2–11–02
x (illegible signature) 2–11–02

Plaintiff asserts that although she wrote the handwritten statement, she did not write it on the evaluation narrative on which it now appears. She testified that she never saw the narrative statement un-til discovery in this case. Plaintiff thus asserts that the document is falsified.

On February 7, 2002, plaintiff called Marfisi and told him that she was going to stay at the Oak Park store because she needed the money due to her husband's medical condition.[7] A few days later, Mar-

---

**7.** Defendant produced evidence that plaintiff did not rescind her resignation until February 11, 2002, when she spoke with Matire on the phone and told him that she was rescinding her resignation pending the result of the investigation.

fisi called plaintiff and told her that defendant had stores opening in Texas and Louisiana if she was willing to move.[8] Plaintiff said that she would not move to Louisiana but that she would check on Texas. Plaintiff called Jeff Jones, her former supervisor in Texas, who said that he would love to have her back. Marfisi later called Jones, however, and warned that plaintiff would make charges of discrimination if she worked for him.

Even though plaintiff had withdrawn her resignation, Marfisi told plaintiff on February 26, 2002, that defendant was accepting her resignation. Plaintiff went to meet him and gave him her store keys. Defendant asserts that its decision makers, Dybicz and Garagiola, thought that plaintiff would not work at Oak Park if Goodfellow remained. Plaintiff testified, however, that she told them that although it would be strained, she would work for Goodfellow. Defendant never notified plaintiff of the outcome of its investigation. Defendant has produced evidence that it accepted plaintiff's resignation based on the understanding that she would not relocate and would not work under Goodfellow. Plaintiff states that she told defendant that she would relocate and would work for Goodfellow.

### Analysis

Plaintiff alleges that in violation of Title VII, defendant subjected her to a racially hostile work environment, subjected her to disparate treatment because of race and demoted and then fired her in retaliation for complaints of discrimination. Defendant seeks summary judgment on each of plaintiff's claims. As to the hostile work environment claim, defendant argues that the conduct of which plaintiff complains did not constitute a hostile work environment or alternatively, that defendant is entitled to the affirmative defense set

out in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633, (1998), because it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities to avoid harm. As to the disparate treatment claims, defendant asserts that plaintiff has not set forth a prima facie case of race discrimination because (1) much of the conduct of which she complains does not constitute adverse employment action, (2) defendant has articulated legitimate business reasons for demoting plaintiff and accepting her resignation, and (3) plaintiff has not set forth evidence that defendant's articulated reasons were a pretext for discrimination. Finally, as to the claim that it demoted and fired plaintiff in retaliation for her complaint of racial harassment, defendant asserts that plaintiff has not set forth a prima facie case of retaliation. Alternatively, defendant also argues that it is entitled to summary judgment on plaintiff's claims for punitive damages under the affirmative defense set out in *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), because any discriminatory actions by its managers were contrary to its good faith efforts to comply with Title VII.

### I. Hostile Work Environment

■ Defendant argues that the conduct of which plaintiff complains was not sufficiently severe or pervasive to create a hostile work environment. To establish a prima facie case of hostile work environment under Title VII, plaintiff must show that (1) she is a member of a protected class; (2) the conduct in question was un-

---

8. The record does not provide the date of this phone call.

welcome; (3) the harassment was based on race; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. *See Brandau v. State of Kan.,* 968 F.Supp. 1416, 1420 (D.Kan.1997). In support of its motion for summary judgment, defendant addresses only the third and fourth elements, *i.e.* whether the harassment was based on race and whether it was sufficiently severe or pervasive to create an abusive working environment.

█ To prevail under a hostile work environment theory, plaintiff must show that racially-oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The existence of such an environment can only be determined by looking at the totality of the circumstances present in the work place, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.; see Faragher,* 524 U.S. at 788, 118 S.Ct. 2275. The Court evaluates these factors from both a subjective and an objective viewpoint. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. The Court must consider not only the effect the discriminatory conduct actually had on plaintiff, but also the impact it likely would have had on a reasonable employee in plaintiff's position. *See Davis v. U.S. Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998). "The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1098 (10th Cir.1999). On the other hand, "isolated incidents of harassment, while in-appropriate and boorish, do not constitute pervasive conduct." *Smith v. N.W. Fin. Acceptance, Inc.,* 129 F.3d 1408, 1414 (10th Cir.1997).

█ In support of its argument, defendant asserts that the alleged discriminatory conduct consisted of only the following: (1) on about ten occasions, Goodfellow played rap music in which the artists used the terms "nigger," "bitch" and "whore;" (2) on a single occasion Goodfellow told plaintiff that the name of the rap artists—NWA—stood for "Niggas With Attitudes;" (3) on a single occasion, Goodfellow asked plaintiff if she could imagine how "the brothers" feel when they see a bunch of white guys riding in a car listening to rap music; (4) on a single occasion, Goodfellow referred to a black woman as a "gal;" and (5) during a business trip, Goodfellow told plaintiff that he did not understand how black people called each other nigger but got upset when white people used the same word. *See Defendant's Memorandum* (Doc. # 39) at 19.

Defendant argues that these allegations are not sufficiently severe or pervasive to establish a prima facie case of a hostile work environment because they do not constitute "a steady barrage of opprobrious racial comments." *See Bolden v. PRC., Inc.,* 43 F.3d 545, 551 (10th Cir. 1994). Defendant asserts that the Tenth Circuit granted summary judgment for a defendant in much more offensive circumstances, including two overtly racial remarks. *Id.* (workplace permeated with "intimidation, ridicule, and insult," but not targeted at plaintiff due to race); *see Witt v. Roadway Exp.,* 136 F.3d 1424, 1428–29 (10th Cir.1998) (two comments in two-year period referring to plaintiff as "nigger" not so pervasive or severe as to constitute racial harassment).

Plaintiff responds that in the totality of the circumstances, she has produced facts

from which a reasonable jury could find racial harassment which was pervasive and both objectively and subjectively offensive. She notes that over a period of about 15 months, in addition to the foregoing incidents, she has produced evidence that Goodfellow asked her sit in the back of the lunch area, told her there was no chicken to eat, asked her to "fetch" his bag, ordered her to get him coffee, told her to give up her chair for another employee, and refused to shake her hand.

Construed in a light most favorable to plaintiff, the record supports a finding that the harassment was sufficiently severe and pervasive to create an abusive working environment. *See O'Shea,* 185 F.3d at 1102; *Hurde v. Jobs Plus–Med,* 299 F.Supp.2d 1196, 1212 (D.Kan.2004). Although this is a close case, the comments and conduct fall within the spectrum of what courts have found sufficient for a rational jury to find a hostile work environment. *See Smith v. N.W. Fin.,* 129 F.3d at 1413–15 (jury reasonably could find that six comments over 23–month period created hostile environment; comments included supervisor, within earshot of plaintiff's coworkers, telling plaintiff to "get a little this weekend" so she would "come back in a better mood;" calling plaintiff a "sad piece of ass;" and telling plaintiff she "would find a decent man if [she] just quit dating Mexicans"); *O'Shea,* 185 F.3d at 1098–1102 (reversing summary judgment where female plaintiff heard male coworker compare his wife to Playboy magazine, describe dream involving naked woman and make frequent derogatory comments about women; coworker told other employees that plaintiff was going to file sexual harassment suit against him; where conduct caused plaintiff to be ostracized by coworkers and impeded ability to do her job); *Hurde,* 299 F.Supp.2d at 1212; *Walker v. UPS,* 76 Fed.Appx. 881, 887 (10th Cir.2003) (eight incidents over eight-month period sufficiently pervasive

to create objectively hostile work environment); *cf. Penry v. Fed. Home Loan Bank,* 155 F.3d 1257, 1263 (10th Cir.1998) (gender-related comments to plaintiff in three-year period too few and far between to be severe or pervasive).

Defendant does not address whether plaintiff has pointed to sufficient evidence to survive summary judgment on the subjective prong of the test. *See Penry,* 155 F.3d at 1261 (plaintiff must showing environment both objectively and subjectively hostile). Plaintiff testified that she asked Goodfellow not to play the rap music, however, and that she was offended by the behavior outlined above and felt that it was motivated by race. Viewed in the light most favorable to plaintiff, this evidence indicates that plaintiff subjectively perceived her work environment to be hostile.

The Court therefore finds that plaintiff has demonstrated a genuine issue of material fact whether defendant subjected her to a hostile work environment harassment based on race.

■ Defendant argues that even if it subjected plaintiff to a hostile work environment, it is shielded from liability under the affirmative defense outlined in *Faragher, supra* and *Ellerth, supra.* Under *Faragher* and *Ellerth,* an employer may escape vicarious liability for the harassing acts of its supervisory employees if it proves a two-pronged affirmative defense. *See Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. The defense can only be raised, however, if the harassing supervisor took no tangible employment action against plaintiff. *Harrison v. Eddy Potash, Inc.,* 248 F.3d 1014, 1024 (10th Cir.2001) (citing *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275).

Defendant asserts that plaintiff does not allege tangible employment action and that under *Faragher* and *Ellerth,* it can escape liability if it can establish by a preponder-

ance of the evidence that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. To succeed on this defense, defendant must demonstrate that it is entitled to judgment as a matter of law on both prongs. *See Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257 (affirmative defense "comprises two necessary elements"); *Harrison*, 248 F.3d at 1024–26 (defendant must prove both prongs).

As in initial matter, defendant asserts that plaintiff has not shown tangible employment action. Tangible employment action is critical, because *Faragher* attempts to shield employers from liability which arises from actions that can only be constructively attributed to them. *Desmarteau v. City of Wichita, Kan.*, 64 F.Supp.2d 1067, 1079 (D.Kan.1999). *Faragher* recognizes that tangible employment actions bring to bear the official power of the employing enterprise and require official acts of the employer. Therefore, if the alleged harasser "directly fired, demoted or reassigned the victim of harassment and that conduct formed part of the factual basis for the sexual harassment claim," the employer is fairly held liable and the *Faragher* defense is not available. *Dunegan v. City of Council Grove, Kan. Water Dep't*, 77 F.Supp.2d 1192, 1200 (D.Kan. 1999).

Defendant asserts that the record reveals only two possible tangible employment actions: demotion and termination. It contends that as a matter of law, demotion was not a tangible action because plaintiff did not suffer a change in benefits or responsibilities. Plaintiff testified, however, that the demotion would result in a loss of salary and future promotion opportunities. Although defendant asserts that plaintiff retained her position as store manager, viewing the facts in a light most favorable to plaintiff, she was clearly demoted and lost job responsibilities, which can only be seen as a tangible job action. *See id.* The record reveals a genuine issue of material fact whether plaintiff has shown tangible job action. Therefore the Court need not determine whether defendant has shown undisputed evidence of both prongs of the *Faragher* defense.

█ Alternatively, even if the Court found no tangible job action, defendant has not shown undisputable evidence of both prongs. Under the first prong, defendant asserts that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, because it had promulgated a sexual harassment policy that was in effect during plaintiff's employment. During her employment, plaintiff received training on how to report "any type" of discrimination or harassment. She received training on how to handle sexual harassment complaints, including a packet titled "Sexual Harassment In The Workplace." The packet began with a statement that defendant has always been committed to providing a working environment free of discrimination and harassment. The statement went on: "To emphasize our concern regarding the latter, we have issued a separate policy statement prohibiting unlawful harassment, including but not limited to sexual harassment. If you believe that you have been the subject of harassment, please contact your supervisor immediately. If this is not appropriate, please use our toll free hotline (1–800–284–4737)." Defendant's Ex. 23. Plaintiff testified, however, that she did not believe and was not trained that defendant's policy

for racial harassment was the same as the policy for sexual harassment.

Defendant has not produced any evidence of the content of the racial harassment training, or even whether and how it defined racial harassment. The Court cannot find that as a matter of law defendant has met the first prong of the *Faragher* defense.

Defendant further asserts that under the second prong of the defense, plaintiff unreasonably failed to take advantage of preventive or corrective opportunities which it provided, or to otherwise avoid harm, *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, because she failed to lodge a complaint until long after the harassment had been occurring. Defendant further asserts that within a week after plaintiff complained, the human resources department launched a comprehensive investigation. Plaintiff counters that when she properly complained about sexual harassment, defendant demoted her within days and then terminated her employment. While the Court agrees that a reasonable jury would likely find that plaintiff did not promptly complain of the harassment, defendant is not entitled to summary judgment on the *Faragher* defense because it has not established that it entitled to summary judgment on the first prong.

## II. Disparate Treatment

█ Plaintiff contends that defendant violated Title VII by subjecting her to different terms, conditions and privileges of employment than similarly situated white employees. *Pretrial Order* (Doc. # 35) filed May 10, 2004 at 8–9. In the pretrial order, plaintiff alleged that defendant discriminated by (1) refusing to train her, (2) not allowing her to do her job, (3) treating her less favorably than white employees, (4) not allowing her to hire African–American employees, (5) forcing her to do menial and demeaning tasks not required of white employees, (6) refusing to let her take medical leave, (7) giving her false evaluations or manufactured documents designed to get her demoted, (8) rating her in a low manner, which affected her pay, benefits and possible advancement, (9) demoting her from area manager to store manager, and (10) terminating her employment. In response to defendant's *motion for summary judgment*, plaintiff states:

> In this case it is undisputed that plaintiff is part of a protected class, African American and that plaintiff suffered an adverse employment action as she was demoted and discharged. The real issue centers on the circumstances that give rise to an inference of discrimination. Plaintiff incorporates all the evidence of hostile work environment into this part. The racial statements made by Goodfellow, his refusal to train the plaintiff and the manufacturing and destruction of documents give rise to discrimination. *See Price Waterhouse v. Hopkins,* 490 U.S. at 294, 109 S.Ct. at 1813 noting that evidence of use of "stereotypes is, of course, quite relevant to the question of discriminatory intent."

*See Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment* (Doc. # 41) at 44. Based on plaintiff's response, she has abandoned any disparate treatment claims except as to training, demotion and termination.

Under Title VII, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Disparate treatment analysis is applied to claims alleging "[t]he employer simply treats some people less

favorably than others because of their race, color, religion, sex, or national origin." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). To prevail on her disparate treatment claim under Title VII, plaintiff must show that the discrimination complained of was intentional. In a Title VII disparate treatment case, plaintiff has the initial burden to make a prima facie showing of race discrimination by defendant. *See Nulf v. Int'l Paper Co.,* 656 F.2d 553, 557 (10th Cir.1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Plaintiff satisfies this burden by presenting a scenario that on its face suggests that defendant more likely than not discriminated against her. *See Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden of establishing a prima facie case of disparate treatment is not onerous. *Id.* If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a "legitimate, nondiscriminatory reason" for the questioned action. *See Nulf,* 656 F.2d at 558. If defendant meets this burden, plaintiff must show that its stated reason is a pretext for prohibited discrimination. *See id.*

As to each claim of disparate treatment, plaintiff may make a prima facie case by showing that "(1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination." *Ammon v. Baron Auto. Group,* 270 F.Supp.2d 1293, 1310 (D.Kan.2003) (citing *Hysten v. Burlington N. & Santa Fe Ry. Co.,* 296 F.3d 1177, 1181 (10th Cir.2002)).

### A. *Refusal To Train*

■ As noted above, plaintiff alleges that defendant violated Title VII by refus-ing to train her. Defendant argues that plaintiff has not produced evidence that similarly situated non-minority employees received training that was materially different from hers. In response, plaintiff points to evidence that defendant trained a "phase II area manager" on using a laptop computer, evaluating financial figures and evaluating payroll. Defendant replies that plaintiff was not a phase II area manager. Plaintiff correctly argues that she is not required to identify similarly situated employees, if she can otherwise point to circumstances which give rise to an inference of discrimination. *See Ammon,* 270 F.Supp.2d at 1310. Plaintiff asserts that the evidence in support of her hostile work environment is sufficient to support an inference that defendant failed to train her because of race. Plaintiff, however, has not shown that defendant's failure to train her was an adverse job action. Plaintiff therefore has not established a prima facie case of failure to train. Defendant is entitled to summary judgment on this claim.

### B. *Demotion*

■ Plaintiff alleges that defendant discriminated against her on account of race when it demoted her from area manager to store manager. Defendant concedes that plaintiff has set forth the first two elements of a prima facie case, *i.e.* that (1) she belongs to a protected class and (2) she suffered an adverse employment action. Plaintiff asserts that she has also produced evidence of the third element—that the demotion occurred under circumstances which give rise to an inference of discrimination. *See Hysten,* 296 F.3d at 1181. Plaintiff notes that Goodfellow completed the team progress reports, which defendant considered in deciding to demote her, and that Goodfellow and Dybicz made the decision to demote her. To show that the decision was made in circumstances which give rise to an inference of discrimination, plaintiff relies upon evi-

dence that Goodfellow created a hostile work environment. The Court finds that based on the analysis of plaintiff's hostile work environment claim, above, plaintiff has demonstrated a prima facie case. The burden therefore shifts to defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's demotion.

Defendant has met this relatively light burden by stating that it demoted plaintiff because Goodfellow, Marfisi and Dybicz agreed that her store had received an "improvement required" audit and that on several occasions Goodfellow rated her store as "improvement required." Because defendant has met its burden, the presumption of discrimination drops from the case and plaintiff must show that defendant's proffered reason was "not the true reason for the employment decision." *Aramburu*, 112 F.3d at 1403.

Plaintiff claims that defendant's proffered reason is pretext because Goodfellow created a racially hostile work environment, and his evaluations are thus suspect. Further, plaintiff points to evidence that she never saw any negative team progress reports or audits, and that she never made the comments which those documents attribute to her, thus suggesting that defendant falsified the documents which it used as one of the reasons to demote her. Plaintiff has established genuine issues of material fact whether defendant's articulated reasons for demoting her were a pretext for discrimination. This claim survives summary judgment.

### C. *Termination*

▉ Plaintiff alleges that defendant discriminated against her on account of race when it terminated her employment. Defendant argues strenuously that plaintiff cannot establish a prima facie case because she has no evidence that defendant terminated her employment, or that it terminated her employment under circumstances which suggest discrimination. Taken in the light most favorable to plaintiff, however, Marfisi asked her to think about remaining as a store manager when she offered to resign on February 4, 2002. Although plaintiff drafted a resignation, she did not turn it in, and she told Marfisi that she would think about it. Plaintiff talked with Marfisi a few days later and told him that she was withdrawing her resignation. After further discussions about where plaintiff might work and whether she would transfer, Marfisi told plaintiff that defendant was accepting her resignation, and that she should come to the store to give him her keys. Viewed in a light most favorable to plaintiff, defendant terminated her employment after she withdrew her resignation.

Defendant's proffered legitimate reason for terminating her employment is that she resigned. Plaintiff must show that defendant's proffered reason was "not the true reason for the employment decision." *Id.* Plaintiff claims that defendant's proffered reason is prextextual because defendant knew that she had withdrawn her resignation. Further, as with the demotion decision, at least part of the decision to terminate plaintiff's employment was based upon Goodfellow's negative team progress reports, and plaintiff has presented evidence that Goodfellow created a racially hostile work environment and falsified her evaluations.[9] Plaintiff has established genuine issues of material fact whether defendant's articulated reasons for terminating her employment were a pretext for discrimination. Defendant is

---

**9.** Plaintiff again points to evidence that she never saw the negative team progress reviews or audits, and that she never made the comments which those documents attributed to her, thus suggesting that defendant falsified the documents which in part it used as the reason to terminate her employment.

not entitled to summary judgment on this claim.

### III. Retaliation

 Plaintiff alleges that in retaliation for her complaint of a racially hostile work environment, defendant demoted her from area manager to store manager and then terminated her employment. Defendant asserts that plaintiff cannot establish a prima facie case of retaliation. To do so, plaintiff must show that "(1) [s]he engaged in protected opposition to discrimination; (2)[s]he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1258 (10th Cir.2001). "As with claims for discriminatory discharge, if the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. If the employer satisfies this burden of production, then, in order to prevail on her retaliation claim, the plaintiff must prove that the employer's articulated reason for the adverse action is pretextual, i.e. unworthy of belief." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir.2001) (quotation omitted).

To establish that she engaged in protected activity under Title VII, plaintiff must show that she participated in a Title VII investigation or opposed Title VII violations. 42 U.S.C. § 2000e–3(a). Plaintiff has produced evidence that throughout her tenure as an area manager in Kansas City, she complained to Goodfellow about his racial remarks. On January 29, 2002, she complained to Garagiola about racially offensive conduct. Informal complaints to superiors constitute protected activity. *O'Neal*, 237 F.3d at 1255; *Pastran v. K–Mart, Corp.*, 210 F.3d 1201, 1205 (10th

Cir.2000). The record therefore supports an inference that plaintiff engaged in protected activity.

Defendant contends that plaintiff cannot establish a causal connection between the protected activity and her demotion and termination. The Tenth Circuit has held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999). Here, plaintiff alleges that she complained in late January of 2002 and was demoted on February 4, 2002. For purposes of defendant's motion, this temporal proximity is sufficient to establish causation. *See id.* Defendant asserts that it decided to demote plaintiff before she complained, but the record supports the inference that Goodfellow decided to wait to see if her performance improved. Defendant asked for plaintiff's keys on February 26, 2002 (less than a month after she complained to Garagiola).

Defendant argues that it demoted plaintiff because she received poor team progress reviews and an "improvement needed" audit, and that she actually resigned and was not terminated. Because defendant articulates facially neutral reasons for its action, the burden shifts to plaintiff to establish pretext. As noted in the analysis of plaintiff's disparate treatment claim, plaintiff has set forth facts from which a reasonable factfinder could find that defendant's proffered reasons are a pretext for discrimination. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997). Plaintiff again points out that at least in part, defendant based its decision to terminate her employment upon Goodfellow's negative team progress reports, and evidence that he created a racially hostile work environment and falsified her evaluations.[10] Plaintiff has established genuine

---

10. She again points to evidence that she never saw any of the negative team progress

issues of material fact whether defendant's articulated reasons for terminating her employment were a pretext for discrimination. Defendant is not entitled to summary judgment on plaintiff's retaliation claim.

## IV. *Kolstad* Defense

 Defendant argues that to the extent that plaintiff's claims are based on vicarious liability, it is entitled to summary judgment on plaintiff's claim for punitive damages. To be eligible for punitive damages, plaintiff must show that defendant discriminated with malice or reckless indifference to federally protected rights. *Deters v. Equifax Credit Info. Servs., Inc.,* 202 F.3d 1262, 1269 (10th Cir.2000); *see* 42 U.S.C. § 1981a(b)(1). In this context, "malice" and "reckless indifference" refer not to the egregiousness of the employer's conduct, but to its knowledge that it may be violating federal law. *Deters,* 202 F.3d at 1269; *see Kolstad,* 527 U.S. at 535, 119 S.Ct. 2118. More specifically, "recklessness and malice are to be inferred when a manager responsible for setting or enforcing policy in the area of discrimination does not respond to complaints, despite knowledge of serious harassment." *Deters,* 202 F.3d at 1269; *see Kolstad,* 527 U.S. at 546, 119 S.Ct. 2118 (defense requires good faith effort to enforce anti-discrimination policy); *Cadena v. Pacesetter Corp.,* 224 F.3d 1203, 1210 (10th Cir. 2000); *Baty v. Willamette Indus., Inc.,* 172 F.3d 1232, 1244–45 (10th Cir.1999). An employer may be liable for punitive damages if it did not adequately address Title VII violations of which it was aware. *Cadena,* 224 F.3d at 1210.

 Defendant asserts that, as a matter of law, any harassment by Goodfellow was contrary to its good faith effort to comply with Title VII. Defendant points to evidence that it had a harassment and discrimination policy and that it investigated plaintiff's complaint within a week of her complaint to Garagiola.

Even though plaintiff does not address defendant's *Kolstad* argument, the Court notes that defendant has not produced any evidence regarding the content of the racial harassment training, or whether and how it defined racial harassment. The Court cannot find that as a matter of law, defendant is entitled to the *Kolstad* defense. The Court therefore overrules defendant's motion for judgment as a matter of law on the issue of punitive damages.

**IT IS THEREFORE ORDERED** that *Defendant's Motion For Summary Judgment* (Doc. # 38) filed June 1, 2004 be and hereby is **SUSTAINED** as to plaintiff's Title VII claim that defendant subjected her to disparate treatment by (1) failing to train her, (2) not allowing her to do her job as assistant manager, (3) treating her less favorably than white employees, (4) not allowing her to hire African–American employees, (5) forcing her to do menial and demeaning tasks not required of white employees, (6) refusing to let her take medical leave, (7) giving her false evaluations or manufactured documents designed to get her demoted, and (8) rating her in a low manner, which affected her pay, benefits and possible advancement.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is otherwise **OVERRULED.** The following claims remain in the case: (1) defendant subjected plaintiff to hostile work environment racial harassment, (2) defendant discriminated against plaintiff on the basis of race when it demoted and fired her, and (3) defendant demoted and fired plaintiff in

reviews or audits, and that she never made the comments which those documents attributed to her, thus suggesting that defendant

falsified the documents which it used in part as the reason to terminate her.

retaliation for complaining of harassment. The affirmative defenses set out in *Faragher* and *Kolstad* also remain for trial.